(No. 53669.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DURLYN EDDMONDS, Appellant.

*Opinion filed January 20, 1984.—Rehearing denied March 30, 1984.*

GOLDENHERSH, CLARK, and SIMON, JJ., dissenting.

Tyrone C. Fahner, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Michael B. Weinstein, Assistant Attorney General, of Chi-

cago, and Michael E. Shabat and Richard T. Sikes, Assistant State's Attorneys, of counsel), for the People.

Steven Clark, Deputy Defender, and Richard E. Cunningham and Martin Carlson, Assistant Appellate Defenders, of Chicago, for appellant.

JUSTICE MORAN delivered the opinion of the court:

In a bench trial in the circuit court of Cook County, defendant, Durlyn Eddmonds, was convicted of murder and deviate sexual assault. Pursuant to section 9—1(d) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(d)) the State requested a death penalty hearing. The court, sitting without a jury, found that there were present one or more of the aggravating factors set forth in section 9—1(b) and that there were no mitigating factors sufficient to preclude a sentence of death. (See Ill. Rev. Stat. 1979, ch. 38, par. 9—1(d).) The court sentenced defendant to death on the murder conviction and 40 to 80 years' imprisonment on the conviction of deviate sexual assault. The sentence of death was stayed (73 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, sec. 4(b); Ill. Rev. Stat. 1979, ch. 38, par. 9—1(i); 73 Ill. 2d R. 603).

In a statement taken by an assistant State's Attorney and transcribed by a court reporter, defendant, age 25, said that in the early morning of October 27, 1977, he called down to the alley below his apartment and asked Richard Miller, age 9, to come upstairs. He had seen the boy with two men, and when Richard came upstairs defendant noted that the boy was bleeding from his rectum. Defendant told Richard that he wanted to have anal intercourse with him as the other men had just done. He proceeded to clean him before having anal sex with him. During the act of intercourse the boy started to cry and asked defendant to stop because he was hurt-

ing him. In an effort to silence Richard, defendant pushed the boy's body face down into a pillow. Defendant later told the police that he did not want the boy to awaken his grandmother in the next room. During the act of intercourse, Richard stopped breathing. When defendant completed the act, he noticed "that the boy wasn't breathing properly." Defendant tried to revive him and, failing that, looked for a place to conceal the body. He put the body in a garbage dumpster in the alley below his apartment and threw the boy's clothes and the materials he had used in cleaning him up into a yellow garbage bag. Defendant scattered the bag and its contents in a nearby alley.

A latent fingerprint examiner for the Chicago police department testified that there were in excess of 12 points of comparison between the impressions found on a newspaper lying near the yellow garbage bag and defendant's right palm print. It was his opinion that the print found on the newspaper was the same as defendant's right palm print. There was also testimony, from a microanalyst from the Chicago police department, that the garbage bag found in the alley and the bags retrieved from defendant's apartment produced similar results when subjected to scientific analysis. The analyst also testified that a sock found in the bag had the same fiber content as one found on the landing of the porch directly in front of defendant's apartment and above the garbage dumpster. Dr. Robert Stein, chief medical examiner of Cook County, testified that he performed an autopsy and that the "cause of [Richard Miller's] death was suffocation in association with contusions and lacerations of the anus."

Defendant testified that a friend of his, Jerome Williams, had come to his apartment in a nervous state. After using the bathroom to clean up, Williams asked if he could use some plastic bags which were lying on defend-

ant's bed. He asked defendant to obtain some heroin and then left the apartment. Defendant also left the apartment, purchased a half ounce of heroin, and gave it to Williams. Williams returned to defendant's apartment shortly after midnight. He was carrying a shopping bag which he took into defendant's bedroom and left there. Both men left the apartment. Defendant returned home at approximately 2:15 a.m. and went to sleep.

When he awoke the next morning he discovered the shopping bag contained a child's clothing, shoes and a yellow plastic bag. His grandmother then told him about the body of the boy which had been found in the alley. Knowing that there was a child's clothing in the shopping bag and that Williams had been arrested for molesting children, defendant quickly left with the shopping bag. He met Williams, and Williams said he would get rid of the bag. They walked to an alley, and Williams dumped the bag.

Defendant also related a conversation with Williams in which Williams told of having sex with the dead boy and then drowning him in a bathtub so that he could not carry out his threat to tell his mother. He also testified to an episode in which Williams had prepared two syringes of heroin, one for himself and one for defendant. He noted that the one intended for him was darker and, while Williams was otherwise engaged, he switched syringes. Thereafter, Williams "shot the heroin" and in a short period of time began to shake. Williams died the following day, apparently of an overdose of heroin.

Defendant testified that the statements he made concerning the sexual assault and the death of the boy were false and were made because the police "would not let him leave and told him what to say." He denied each of the charges against him.

The court found defendant guilty of murder. The State moved for a death penalty hearing and, in the first

part of the hearing, it was stipulated that the court could consider all evidence introduced at the trial. The court, on the basis of the evidence admitted at trial, found that defendant was over 18 years of age; that the murder occurred during the commission of the felony of deviate sexual assault; and that defendant was eligible for the death penalty. (See Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6).) The court then heard evidence in aggravation and mitigation.

The State introduced the testimony of a victim of a previous rape committed by defendant and the testimony of a police officer who had investigated two other rapes for which defendant had been convicted. The State also introduced certified copies of the three convictions. Additionally, the court heard the testimony of a man who said that he was homosexually raped by defendant while defendant was awaiting trial in the Cook County jail on the present charge. The witness had been convicted of theft, robbery, and aggravated battery and, at the time of defendant's trial, was serving a sentence on the latter charge.

In mitigation, defendant offered the testimony of Dr. Robert Reifman, the director of the Psychiatric Institute of the circuit court of Cook County. He reviewed his findings based on two examinations of defendant but was unable to render an opinion whether, at the time the offense was committed, defendant was under the influence of an extreme mental or emotional disturbance.

The court also reviewed the presentence investigation of defendant and found no mitigating factors sufficient to preclude the imposition of the death penalty. The court sentenced defendant to death for the murder and 40 to 80 years' imprisonment for the deviate sexual assault.

Defendant contends first that it was error to proceed to trial without conducting a fitness hearing. He argues

that the circuit court found a *bona fide* doubt of his fitness because it twice ordered a fitness hearing, and since a *bona fide* doubt existed, it could only be resolved through a fitness hearing. Defendant argues that proceeding to trial without a fitness hearing violated his due process rights. The State contends that at the time of trial there existed no *bona fide* doubt of defendant's fitness. In support of its position, the State asserts that the earlier reports showing defendant to be unfit were effectively refuted both by more recent reports showing defendant to be fit and also by defendant's own rational behavior in the courtroom. The State also contends that the issue was waived by the failure of defendant's counsel to insist upon a hearing before trial and to raise the issue in a post-trial motion.

We consider first the State's contention that the issue of fitness is waived. As the court said in *People v. Jones* (1982), 94 Ill. 2d 275, 294-95:

> "In *People v. Carlson* (1980), 79 Ill. 2d 564, this court considered whether alleged errors not objected to by defendant at trial were waived. After examining the waiver doctrine, and our Rule 615(a) (73 Ill. 2d R. 615(a)), which embodies the exception to the waiver rule, the court adhered to the rule that even in the absence of objection at trial, a court of review will grant relief if the trial error is so prejudicial that real justice has been denied or the verdict of the jury resulted from such error. (See *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77; *People v. Wright* (1974), 56 Ill. 2d 523, 533-34; *People v. Manzella* (1973), 56 Ill. 2d 187, 200.) The same rule applies whether the alleged errors occurred at trial or at sentencing."

As the court did in *Jones,* we have reviewed the transcript and the alleged errors to determine whether defendant was deprived of any of his fundamental rights.

Defendant was charged by information with murder and deviate sexual assault. Several days later, at the re-

quest of the assistant public defender, the circuit court ordered a psychiatric examination. On December 6, 1977, Dr. Reifman, of the Psychiatric Institute for the circuit court of Cook County, reported in a letter that defendant was unfit for trial. Pursuant to this report, the public defender petitioned for a fitness hearing by jury. The court ordered that a fitness hearing be held on January 12, 1978. On that date, the public defender presented to the court a report from Dr. Jewett Goldsmith of the State Department of Mental Health, stating that defendant was fit for trial. Another examination was ordered, and on January 25, 1978, Dr. Albert Stipes, a private psychiatrist, reported that defendant was unfit for trial. The public defender again petitioned the court for a fitness hearing by jury, and a hearing was set for March 8, 1978. On that date and two subsequent dates the hearing was continued by agreement.

On May 25, 1978, the public defender advised the court that he had spoken to Dr. Reifman, the author of the first psychiatric report in which it was stated that defendant was unfit to stand trial, and that the doctor had requested that he be permitted to reinterview defendant prior to testifying at the hearing. Defendant was subsequently reexamined by Dr. Reifman on June 6, 1978. He reported that defendant was "fit to stand trial with medication." Defense counsel then asked the court to order a psychiatric examination to determine defendant's sanity at the time of the offense. The record shows that the next day Dr. Gerson Kaplan of the Psychiatric Institute reported that he could give no opinion as to defendant's sanity at the time of the offense.

A transcript of proceedings on March 13, 1979, shows that there was some confusion as to whether defendant had been declared unfit to stand trial. On April 4, 1979, defense counsel offered to "simplify the matter" by requesting a reexamination of defendant both as to his sanity at the time of the offense and as to his fitness to stand

trial. Examinations were ordered by the court, and defendant was reexamined by Dr. Kaplan, whose report dated April 10, 1979, stated that defendant was fit for trial.

In May of 1979, defendant, *pro se,* prepared and filed a motion asking the court to appoint an attorney from the bar association to represent him, rather than from the public defender's office. A new attorney was appointed for the defendant, and the newly appointed counsel promptly moved for a psychiatric examination of defendant to determine his sanity at the time of the offense. On October 1, 1979, Dr. Kaplan reported that in his opinion defendant was sane at the time of the offense. Defendant then asked for an examination by another doctor to obtain a second opinion concerning defendant's sanity at the time of the offense. This examination was ordered, but no report of the results of that examination is contained in the record.

Conviction of a person who is in fact unfit to stand trial violates due process (*Pate v. Robinson* (1966), 383 U.S. 375, 378, 15 L. Ed. 2d 815, 818, 86 S. Ct. 836, 838), but the question of whether or not a *bona fide* doubt of fitness has been raised is largely within the discretion of the trial court (*People v. Murphy* (1978), 72 Ill. 2d 421, 431). At the time of trial, in June of 1980, the most recent psychiatric reports available to the court tended to show that defendant was fit for trial. Defendant's counsel made no further request for a fitness hearing. In addition, defendant testified lucidly at both the hearing on his motion to suppress evidence and at his trial. Defendant testified concerning the events preceding his making statements to the police and his version of his involvement with the victim. The record shows that his answers to questions were to the effect that his confessions were not voluntary and that he denied he was guilty of the charges. The only evidence of defendant's unfitness for trial were reports by one doctor who subsequently changed his opinion, and of another doctor whose report of unfitness was made more than two

years before trial.

"[T]he determination of whether there is a *bona fide* doubt of fitness for trial depends on the facts of each case." (*People v. Murphy* (1978), 72 Ill. 2d 421, 435.) On this record we cannot say that the circuit court erred in failing to order, *sua sponte*, another fitness hearing.

Defendant contends that his statements made while in police custody were taken in violation of his fourth amendment rights and should have been suppressed. He argues that the statements used against him at trial were the product of an illegal arrest; that he was placed under arrest at the time he was brought to the police station; and, at that time, the officers did not have probable cause to arrest him. The State contends that defendant voluntarily accompanied the officers to the police station for questioning, and that his arrest occurred only after he incriminated himself by mentioning that he had handled the victim's clothing. Alternatively, the State argues that at the time defendant was picked up at his apartment, at his request, there was probable cause to arrest him.

According to the testimony adduced at the hearing to suppress defendant's statements, Officers Willie Johnson and Albert Jordan canvassed the neighborhood where the body was found. The officers spoke with defendant and his grandmother, who resided in the second-floor apartment adjacent to the landing where a child's bloody sock was found. Defendant told the police that he knew nothing concerning the homicide. A few days later, Officer Johnson received information from another police officer that defendant was a known sex offender. Officers Johnson and Jordan returned to defendant's apartment. Defendant was not at home, and the officers left word with defendant's grandmother to have him call them as soon as he returned home. During this visit the officers observed yellow garbage bags in the defendant's apartment, similar to one found containing a child's clothing. At about 1 p.m. defend-

ant called the police and asked them to pick him up. The officers returned to the apartment a little after 3 p.m. and advised defendant of his constitutional rights. Defendant agreed to leave with the officers, and they took him to headquarters, stopping on the way to buy defendant lunch.

Defendant was placed in an interrogation room and was again advised of his rights. When asked about the body found behind his apartment building, he denied any knowledge of what had occurred. In the course of the conversation, Officer Johnson mentioned that the yellow plastic bag, found in a nearby alley with a child's clothing, resembled a yellow bag viewed inside defendant's apartment. Johnson left the interview room, but returned in about three or four minutes. When he returned and began a second conversation, the subject of the yellow bag came up again. Defendant admitted that he had found some children's clothing and that he had placed the clothing, including a child's sock, inside a yellow bag. The box of yellow bags, viewed inside defendant's apartment, was later retrieved by the police, pursuant to a written consent form signed by defendant's grandmother. Johnson testified that after defendant admitted he had handled the child's clothing he was no longer free to leave the station house.

Defendant's version of the occurrences of that day, and of how he met the police at his home, is similar to that of the State, but he adds that when he left with the officers he was under the influence of alcohol and drugs. Defendant also asserts that he was mistreated by the officers before telling them a story that he "felt might suit what they wanted ***."

Relying on *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, defendant argues that he was illegally arrested when, without probable cause, he was taken to the police station and interrogated at various times for a period of more than 10 hours. He contends that because his admissions were the product of an unlaw-

ful detention, they should have been suppressed pursuant to his motion. *People v. Townes* (1982), 91 Ill. 2d 32, 36.

In *Townes*, the defendant was asked to accompany police officers to the station house for questioning about an assault on a woman. He was given the choice of accompanying the officers in the police car or driving his own car to the station. Defendant rode with the policemen, arriving at the station at 9:30 a.m. After informing him of his constitutional rights, the police conducted a series of interviews. During the first few interviews, the defendant gave an explanation for his whereabouts at the time of the crime and explained away his apparent injuries, which were consistent with those described by the victim of the offense. Between 6 p.m. and 10:10 p.m. of that same day, a final interview was conducted with the defendant during which he admitted having sexual relations with the victim, but maintained that they were consensual.

In *Townes*, the State conceded that the police lacked probable cause to arrest Townes at the time they visited his residence. They argued, however, that Townes was never "seized" and, thus, probable cause was unnecessary. The State contended that defendant acted voluntarily and that his statements were admissible.

The court held that the 12 hours of questioning to which defendant was subjected exceeded constitutional bounds and that his alleged voluntary cooperation did not purge the taint of an illegal detention. (91 Ill. 2d 32, 38-39.) It was concluded that a defendant could not be subjected to a lengthy interrogation at the police station without probable cause.

We find this case distinguishable from *Townes* and, for the reasons to follow, find that defendant's statements were not taken in violation of his fourth amendment rights. We consider first the State's contention that the police had probable cause to detain defendant upon their third visit to his apartment to bring him to the station. It

is well established that, under the standard used to determine whether probable cause to arrest exists, police officers need not possess evidence sufficient to convict a defendant. (See, *e.g., People v. Moody* (1983), 94 Ill. 2d 1, 7; *People v. Lippert* (1982), 89 Ill. 2d 171, 178; *People v. Marino* (1970), 44 Ill. 2d 562, 573.) Rather, they need only have knowledge of facts which would lead a reasonable man to believe that a crime has occurred and that it has been committed by the defendant. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 166; *People v. Lippert* (1982), 89 Ill. 2d 171, 178-79; *People v. Creach* (1980), 79 Ill. 2d 96, 102, *cert. denied* (1980), 449 U.S. 1010, 66 L. Ed. 2d 467, 101 S. Ct. 564; *People v. Robinson* (1976), 62 Ill. 2d 273, 276-77.) Application of that standard to the facts in this record clearly demonstrates that the police had probable cause to arrest defendant at the time that he voluntarily accompanied them to the station house.

When the investigating officers returned to defendant's apartment the third time, they were aware of the following facts: (1) the victim's body had been found in a garbage dumpster in the alley directly behind defendant's apartment; (2) the victim had probably been sexually molested; (3) the defendant was a previous sex offender; (4) the defendant lived in a second-floor apartment and a blood-stained sock had been found on the second-floor landing of defendant's apartment building; (5) the sock matched a semen-stained sock found in a yellow plastic bag, along with the victim's clothing, about a block and a half from defendant's apartment; and (6) the yellow plastic bag resembled a yellow plastic bag viewed inside defendant's apartment.

When viewed in their totality, these facts and circumstances, known to the investigators, at the time defendant went to the station house, were certainly sufficient to warrant the reasonable belief that an offense had been committed and that defendant had committed the offense. As such, the situation presented by these facts is quite differ-

ent from that in *Townes*, where probable cause to arrest did not exist at the outset of questioning but, rather, arose only after a lengthy detention and interrogation.

The instant case is also distinguishable from *Townes* in that Townes was subjected to more than 12 hours of interrogation *before* he made the inculpatory statement which provided the probable cause for a legal arrest. In the case at bar, the defendant admitted handling the victim's clothing at the beginning of the interrogation, at which time, the officers testified, defendant was no longer free to leave. In any event, *Townes* is inapposite because the record in this cause reveals that defendant was not under arrest at the time that he made the incriminating statement which, in conjunction with the other facts known to the police, gave rise to the probable cause to detain him.

An individual has not been arrested unless the circumstances are such that a reasonable man would conclude that he was not free to leave. (See *United States v. Mendenhall* (1980), 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877.) The testimony of defendant disclosed that he voluntarily consented to accompany the police officers to the station house. When defendant's grandmother told him that the police wanted to speak with him, he replied that he was "going to call the investigators and tell them that [he] was home and if they had anything to say, or whatever, then [he] would go with them." Defendant did, in fact, call the police and asked to be picked up. These facts indicate that defendant volunteered to meet with the police and was prepared to accompany them before the officers asked him if he was willing to go to the police station. In view of these circumstances, we find that a reasonable man would believe that he was free to leave the station house and was not, therefore, under arrest.

Considerations of the facts and circumstances indicate that defendant went voluntarily to police headquarters to undergo questioning even though probable cause for his ar-

rest then existed. In any event, the record makes entirely clear the fact that the time span between defendant's voluntary departure for the police station and the incriminating statement was within permissible limits. We hold, therefore, that on either theory, the defendant's fourth amendment rights were not violated.

Defendant next argues that the death penalty cannot be imposed because the State failed to prove, beyond a reasonable doubt, that defendant intended to kill or knew that his acts created a strong probability of death or great bodily harm. Defendant argues that since there is only one version of how the alleged murder occurred, and since that version negates the required mental state, it cannot be relied upon by the trier of fact to find an intent to kill or a knowledge that the acts created a strong probability of death or great bodily harm.

The circuit court was not required to believe that a 185-pound man placing all of his weight upon a 55-pound nine-year-old boy, while pushing the boy's face into a pillow, did not intend to kill the boy or did not know that his acts created a strong probability of death or great bodily harm. The court, believing that defendant committed the acts admitted in the statement, was entitled to infer the requisite mental state. *People v. Latimer* (1966), 35 Ill. 2d 178, 182-83.

Defendant contends next that his fifth and sixth amendment rights were violated by the State's use at sentencing of a court-ordered social investigation report. This issue might be deemed waived since the record shows that the investigation of the defendant was ordered by the court and agreed to by defense counsel. In addition, defendant failed to object, in any manner, at the sentencing hearing to the State's reference to the report. Two weeks intervened between the sentencing hearing and the actual sentencing. Although defendant presented motions for a new trial and in arrest of judgment, he did not bring the pre-

sentence-report issue to the attention of the circuit court. Neither defendant nor his counsel objected to the use of the presentence report at the actual sentencing disposition. Under these circumstances, absent plain error, we would hold that the issue is waived. However, because defendant contends that the failure to object was due to the alleged incompetence of his trial counsel, we shall consider it.

Defendant asserts that the social investigation report was improperly used against him at the sentencing hearing. He claims the State attempted to establish that he had no remorse for his acts, by mentioning his lack of religious beliefs. He argues, too, that the court obviously used his lack of schooling or military service against him. The State responds that the comments about religion were made only to show a lack of remorse, which was proved at the sentencing hearing by other competent evidence such as his past criminal record and his comments to a fellow inmate. The State also argues that defendant's lack of religious beliefs was shown not only in his comments to the probation officer, but also in his comments to his first rape victim. The State also points out that the other information in the social investigation report about defendant's background was not used against him but, instead, was used by the court in an attempt to find mitigating factors.

Comments concerning a defendant's religion are improper but were not prejudicial here. Defendant had told his first rape victim, in response to her statement that she was Catholic, that he "didn't believe in that kind of thing." The record does not show that the court relied upon the comment about religion in imposing the death sentence; to the contrary, the record shows that the court used the report in an attempt to find mitigating, not aggravating, factors:

> "The Court has considered other mitigating factors including, but not limited to those contained in the social investigation report wherein the defendant's family's his-

tory, educational background, and employment record are outlined. Any Judge confronted with the awesome responsibility of rendering a death sentence must search for valid justification against imposing this penalty and favoring an alternative punishment."

It does not appear that an objection from defense counsel to the use of the report by the State and by the court would have changed the result or assisted defendant in any meaningful way. We cannot say that there was either plain error or a showing of ineffective assistance of counsel.

Defendant next contends that due process was violated at the death penalty hearing where the court considered a presentence report which had not been shown to defendant or his counsel. It is well settled that defendant has a right to review and comment on matters contained in a presentence investigation report. (*Gardner v. Florida* (1977), 430 U.S. 349, 51 L. Ed. 2d 393, 97 S. Ct. 1197.) It is clear from the record, however, that defendant was given this opportunity. On June 26, 1980, during the death penalty hearing, the assistant State's Attorney referred to the "pretrial" investigation report which "was ordered and supplied counsel in the court this afternoon \*\*\*." No objection was made to this reference. Sentence was not imposed until two weeks later, and before imposing sentence, the circuit court permitted defendant the opportunity to make "any statement that you wish." Neither defendant nor his attorney complained at this time of a lack of opportunity to examine the report. The report itself shows that it was due on June 16, 1980, three days before the trial began, and the record does not support defendant's contention that the report was unavailable for his examination prior to sentencing.

Defendant contends next that the court's consideration of unreliable hearsay testimony requires that his death sentence be vacated. Defendant, however, did not object to the introduction of the testimony that he now contends was

improperly considered. Because there was no objection, and this matter does not rise to the level of plain error, this issue would ordinarily be held to be waived (*People v. Carlson* (1980), 79 Ill. 2d 564, 576-77); however, because of defendant's contention that the failure to object to the testimony denied him the effective assistance of counsel, we elect to consider it.

A sentencing judge can " '*** exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by the law.' " (*People v. La Pointe* (1981), 88 Ill. 2d 482, 496, quoting *People v. Adkins* (1968), 41 Ill. 2d 297, 300.) This court has recognized that section 9—1(e) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(e)) "allows for the introduction of evidence during the second phase of the sentencing hearing which would not be admissible during the guilt phase of trial. *** The factors controlling admissibility are the relevance and reliability of the proffered evidence. This determination lies within the discretion of the trial judge." *People v. Davis* (1983), 95 Ill. 2d 1, 43.

The testimony complained of was that of a police officer who had interviewed the victims of two prior rapes for which defendant had been convicted. After reviewing the reports the officer testified concerning the facts of the offenses. The records of conviction were then admitted into evidence. The other hearsay, made by the victim of an alleged homosexual rape, was the statement that defendant was reputed to have raped other prisoners in the county jail. This statement was not elicited by the State's interrogation of the witness and was not responsive to the question put to him. The evidence complained of is not of sufficient significance to justify a lengthy analysis of what information in aggravation and mitigation under section 9—1(c) may be admitted in a bench hearing. Assuming, *arguendo*, that any of the hearsay complained of was inad-

missible, the trial judge, in a bench trial, is presumed to have considered only properly admitted evidence and defendant was not prejudiced.

Defendant also complains that he was denied due process by the admission of testimony calculated to appeal to racial prejudice. Because the testimony was not objected to, and the issue does not rise to the level of plain error, we again consider it only because of defendant's assertion of ineffective assistance of counsel.

Defendant asserts that an inference was made by one of the State's witnesses that in the penal system white men are generally preyed upon by blacks. While appeals to racial prejudice are to be condemned (*People v. Dukett* (1974), 56 Ill. 2d 432, 443), we are of the opinion that the inference, if any, was vague and discernible only after a complete review of the record. It resulted in no prejudice to defendant at trial, and we hold that counsel was not incompetent for failing to object to a vague reference to race.

Defendant also contends that he was denied due process when the prosecution was permitted rebuttal argument at the second phase of the sentencing hearing. Defendant argues that since the State does not have the burden of proving the absence of mitigating factors, it should not be allowed rebuttal argument. Although the issue was waived because of the failure of trial counsel to object, and is not plain error, nevertheless, we reach it in order to consider defendant's claim of ineffective assistance of counsel. We find that defendant was not denied the effective assistance of counsel due to trial counsel's failure to object to this procedure because such an objection would have been overruled. The State is the moving party in a death penalty proceeding (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(d)) and, as such, is entitled to rebuttal argument. See *Liptak v. Security Benefit Association* (1932), 350 Ill. 614. See also *People v. Kubat* (1983), 94 Ill. 2d 437, 488 (where this issue

was raised and decided adversely to the defendant).

Defendant raises a number of constitutional challenges to the death penalty statute. The first is that the death penalty cannot be imposed since the court did not find that he "intentionally" killed the victim. Defendant contends that a sentence of death not based on an explicit finding of an intent to kill violates the eighth and fourteenth amendments. Defendant argues that a sentence of death is excessive, and thus unconstitutional, for conduct where the defendant only "knows" that his acts create a strong probability of death or great bodily harm. Defendant primarily relies upon the concurring opinion of Justice White in *Lockett v. Ohio* (1978), 438 U.S. 586, 621, 57 L. Ed. 2d 973, 1000, 98 S. Ct. 2954, 2981, and *Bell v. Ohio* (1978), 438 U.S. 637, 57 L. Ed. 2d 1010, 98 S. Ct. 2977. In that opinion, which reaches an issue not considered by the full court, Justice White states that a punishment is disproportionate, and thus unconstitutional, if it makes no measurable contribution to acceptable goals of punishment or if it is out of proportion to the severity of the crime. *Lockett v. Ohio* (1978), 438 U.S. 586, 624, 57 L. Ed. 2d 973, 1002, 98 S. Ct. 2954, 2983 (White, J., concurring).

The apparent rationale of making the death penalty applicable to a murder during the commission of another felony (see Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(6)(c)) is to deter further acts of violence during the commission of those felonies. In these situations, knowledge that the proscribed conduct has created the strong probability of death or great bodily harm to the victim is sufficient and proof of specific intent has not been required. See *Gregg v. Georgia* (1976), 428 U.S. 153, 221 n.10, 49 L. Ed. 2d 859, 901 n.10, 96 S. Ct. 2909, 2947 n.10 (White, J., concurring). *Cf. People v. Davis* (1983), 95 Ill. 2d 1, 36 (where this court held that the statute which provides that convictions for murdering two or more individuals constitute an aggravating factor sufficient for the imposition of the death penalty (Ill.

Rev. Stat. 1979, ch. 38, par. 9—1(b)(3)) is applicable where a defendant is convicted of two or more murders resulting from either intentional or knowing acts).

Defendant next argues that because the Illinois death penalty statute does not require that the State prove, beyond a reasonable doubt, the absence of mitigating factors, it is invalid. This argument fails, since it is inconsistent with this court's holding that the statute requires that a weighing process take place. (*People v. Brownell* (1980), 79 Ill. 2d 508, 537-38; *People v. Free* (1983), 94 Ill. 2d 378, 421.) The court stated in *Brownell*, "[W]hile the precise weight to be given each aggravating and mitigating factor is not made a matter of numerical calculation, that is not a constitutional infirmity." (79 Ill. 2d 508, 534.) The balancing process, outlined in *Brownell*, does not require that the State bear the burden of proving the absence of the statutory mitigating factors. As stated in *Proffitt v. Florida*:

> "While the various factors to be considered by the sentencing authorities do not have numerical weights assigned to them, the requirements of *Furman* [(*Furman v. Georgia* (1972), 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726)] are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition." (*Proffitt v. Florida* (1976), 428 U.S. 242, 258, 49 L. Ed. 2d 913, 926, 96 S. Ct. 2960, 2969; see *People v. Jones* (1982), 94 Ill. 2d 275.)

Neither *Furman* nor the Constitution imposes upon the State the heavy burden of proving the absence of mitigating factors beyond a reasonable doubt, and we decline to do so here.

Defendant also contends that the death penalty statute fails to provide adequate comparative review procedures. This question was considered in *People v. Brownell* (1980),

79 Ill. 2d 508, 541-44, and we decline to reconsider it here.

Defendant also argues that the sentence discretion vested in the prosecution by the death penalty statute is an unconstitutional delegation of legislative and judicial authority. This issue was decided in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 535-39, and will not be further considered here.

Defendant's contention that he was denied the effective assistance of counsel at the death penalty hearing requires further discussion. A defendant is entitled to competent, not perfect, representation. (*People v. Greer* (1980), 79 Ill. 2d 103, 121; *People v. Berland* (1978), 74 Ill. 2d 286.) The inadequacy of a defendant's trial counsel entitles him to a new trial if his appointed counsel was actually incompetent, as reflected in the performance of his duties as trial attorney, and if this incompetence resulted in substantial prejudice to the defendant without which the result of his trial would probably have been different. (*People v. Greer* (1980), 79 Ill. 2d 103, 121.) Competency is determined from the totality of counsel's conduct at trial. (*People v. Murphy* (1978), 72 Ill. 2d 421, 437.) It should be noted that defendant complains now of incompetency only during the sentencing hearing, and no complaint is raised of ineffective assistance of counsel during the trial.

Applying the standards enunciated in *Greer* and *Murphy*, we hold that defendant was not denied the effective assistance of counsel. Defendant cites two additional instances of counsel's conduct in support of his argument. First, defendant complains that his counsel failed to present either lay or expert testimony to establish that defendant had diminished mental capacity at the time of the offense although not to such an extent as to constitute a defense to the charges. Defendant, however, points to no evidence which was available at the time of the hearing which would have tended to show this mitigating factor. It

is not certain that evidence of this type would have resulted in a different sentence, and from our examination of the psychiatric reports that were available, it is unlikely that defendant's trial counsel could have found expert testimony to prove the presence of diminished mental capacity at the time of the offense. We find no basis to hold that had counsel taken other action the result would have been different.

Second, defendant contends that trial counsel's closing argument at the sentencing hearing was so insufficient as to deny him the effective assistance of counsel. We cannot agree. Under the circumstances, where trial counsel was unable to present substantial evidence in mitigation, we find no basis to question counsel's decision to present a brief argument for mercy. Errors in judgment or trial strategy do not establish incompetence. *People v. Murphy* (1978), 72 Ill. 2d 421, 437.

The remaining matters upon which defendant bases his contention of counsel's incompetence have been reviewed in the discussion of other issues and need not be further considered. Upon reviewing counsel's conduct throughout the trial and the sentencing hearing we hold that defendant received effective assistance of counsel.

"Our responsibilities neither require nor permit reversal where no reasonable doubt of guilt exists, no reversible error has occurred, and there is no indication that the [court] imposed the penalty in an arbitrary, capricious or uneven manner." *People v. Free* (1983), 94 Ill. 2d 378, 430.

For the reasons stated, the judgments of conviction and sentence of death of the circuit court of Cook County are affirmed. The clerk of this court is directed to enter an order setting Wednesday, May 23, 1984, as the date on which the sentence of death entered by the circuit court of Cook County shall be executed in the manner provided by law. A certified copy of this order shall be furnished by

the clerk of this court to the Director of Corrections, to the warden at Stateville Correctional Center, and to the warden of the institution wherein defendant is confined.

*Judgment affirmed.*

JUSTICE GOLDENHERSH, dissenting:

I dissent. I would reverse the judgment and remand the cause for a new trial. The striking similarity to the factual situation in *People v. Townes* (1982), 91 Ill. 2d 32, requires that we hold that there was here a violation of defendant's fourth amendment rights.

I do not agree that there was probable cause for detaining or seizing defendant. Obviously, the police did not think there was probable cause or they would not have waited for him to appear voluntarily. The facts enumerated in the majority opinion as the purported basis for probable cause fail to consider how many apartments shared the landing and the use of the dumpster and fail to mention that there was nothing which shows that defendant was in the area when the crime was committed. Obviously, the police did not believe that they had probable cause until defendant admitted handling the deceased boy's clothing. Officer Johnson testified that after that admission defendant was no longer free to leave the station.

The People's contention that there was probable cause for defendant's arrest was argued as an alternative to their basic contention that defendant's presence at the police station was voluntary and that probable cause for his arrest arose soon after the interrogation began. Whether he had been "seized" at the time of the statement which provided probable cause for further detention must be determined from the totality of the circumstances. (*United States v. Mendenhall* (1980), 446 U.S. 544, 557, 64 L. Ed. 2d 497, 511, 100 S. Ct. 1870, 1879.) The question is whether the police had restrained defendant's freedom, and the answer depends upon whether, in view of all of

the circumstances, a reasonable man, innocent of any crime, would have considered himself under arrest. 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877.

The record does not show how much time elapsed between defendant's departure from his apartment with the police officers and the time when he made the statement about the clothing. Officer Johnson testified that defendant was picked up at "a little after three, 3:30." Officer Johnson also testified that defendant admitted he had handled the clothes in the alley early in their second conversation at the police station, which was three or four minutes after their first conversation. The record does not show the length of their first conversation nor does it indicate how long it took the officers to travel to the police station with defendant. The record does disclose that, after the statement about the clothing, defendant was transported to another location for a polygraph test, which he refused to take, and upon his return to the station house, Officer Johnson saw him again at 6:30 that same evening. He talked to his grandmother sometime after 7 p.m. and to an assistant State's Attorney at 9 p.m. The statement admitted into evidence was signed at 5 a.m. the next morning.

Defendant was not told at any time that he was free to leave the interrogation room, nor, after the admission which gave rise to probable cause, was he told that he was no longer free to leave. It is difficult to believe that an individual who had spent several hours in an interrogation room with at least two police officers could have believed that he was free to leave unless he was told that he could. Applying the *Mendenhall* test, defendant could have reasonably considered himself under arrest from the beginning of the interrogation.

This record shows that approximately 14 hours elapsed between the time that defendant voluntarily went to the

police station and the time the statement was signed. This is the same violation of defendant's fourth amendment rights that was present in *Townes* and requires reversal and remandment for a new trial.

CLARK and SIMON, JJ., join in this dissent.