THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FAYGIE FIELDS, Defendant-Appellant.

First District (1st Division) No. 1—86—0299

Opinion filed June 11, 1990.

890

Randolph N. Stone, Public Defender, of Chicago (Thomas M. Donnelly and Julie Hull, Assistant Public Defenders, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Diann Doppelt, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:
Following a bench trial, defendant, Faygie Fields, was found guilty of murder, felony murder, armed robbery, home invasion and armed violence. (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), 9—1(a)(3), 18—2(a), 12—11(a), 33A—2, respectively.) Judgment was entered as to the murder and felony murder convictions only, all other offenses having merged with the murder conviction. Defendant was then sentenced to a prison term of 40 years. On appeal, defendant contends that: (1) defense counsel's failure to investigate defendant's

psychiatric history constituted ineffective assistance of counsel; (2) the trial court erred in failing to hold a fitness hearing *sua sponte*; (3) defense counsel's failure to move to suppress the bullets seized in a warrantless search of defendant's home constituted ineffective assistance of counsel; (4) the testimony of Jeffery Hill, sole eyewitness, was so unlikely and improbable as to be insufficient to sustain defendant's conviction; and (5) the trial court erred in entering judgment on two counts of murder when only one person was murdered. For the following reasons, the judgment of the trial court is affirmed in part, vacated in part, and remanded for resentencing.

The record sets forth the following facts. At the preliminary hearing on June 8, 1984, defense counsel Meismer requested a behavior clinic examination of defendant prior to arraignment. The trial court granted the request and ordered the examination. Dr. Stephen Cann, staff psychiatrist for the Psychiatric Institute, examined defendant and found that he was not fit for trial at that time. Dr. Cann's report stated that defendant would most likely become fit for trial within one year if he underwent treatment and that defendant's sanity at the time of the offense could not be evaluated at that time due to an absence of police reports. The matter was continued to August 1, 1984, at which time the State requested that defendant be given another psychiatric examination. The trial court granted the State's request. The record contains a psychological exam interim form signed by Dr. Michael Rabin, staff psychiatrist at the Psychiatric Institute, dated August 9, 1984, which stated that defendant was fit for trial and had been legally sane at the time of the offense. The record also contains two reports, dated September 28, 1984, and October 17, 1984, in which Drs. Gerson Kaplan and Gilbert Bogan, also staff psychiatrists at the Psychiatric Institute, concurred with Dr. Rabin's earlier opinion that defendant was fit for trial and had been legally sane at the time of the offense.

Subsequently, on October 31, 1984, defense counsel David Beister requested a full hearing on defendant's fitness with all examining psychiatrists as well as Dr. Chin, the psychiatrist who had been treating defendant for the past year, in attendance. The trial court granted defense counsel Beister's request and continued the matter to November 27, 1984. On November 27, defense counsel Meismer stated that Dr. Chin's report had not yet been received and requested and was granted a continuance to December 21, 1984. On January 8, 1985, defense counsel Meismer stated that because no order had been prepared allowing a private doctor to examine defendant, defendant's private doctor, Dr. Busey, had not been permitted to examine defend-

ant at the jail.[1] The court then signed the order allowing defendant to be examined by the private doctor.

On January 29, 1985, defense counsel Meismer informed the trial court that defendant's mother had requested a new attorney. Accordingly, Meismer moved to withdraw and tendered his files to the court. Thereafter, on February 5, 1985, attorney Marshall Weinberg filed his appearance on behalf of defendant. The court turned over defendant's files to Weinberg and granted a continuance to March 6, 1985. On that date, Weinberg moved to withdraw as counsel on the ground that the family refused to cooperate and he needed their cooperation because defendant was underage. Weinberg stated that if the family cooperated, he would withdraw his motion. Thereafter, on April 10, 1985, Weinberg renewed his motion to withdraw, stating that defendant was indigent and had requested a public defender. On May 8, 1985, the court-appointed public defender informed the court that a private attorney had been retained by defendant. On May 10, 1985, private attorneys Muslim and Wilkie filed appearances on behalf of defendant. Discovery was tendered to the new counsel, and the trial court told them that they would not be permitted to withdraw.

Following several continuances, at the hearing on September 25, 1985, defense counsel Wilkie informed the court that the matter was before the court to determine defendant's competency to stand trial. The court asked, "When did this come up?" The State interjected that reports filed in September and October 1984 had indicated that defendant was fit for trial. The court then asked, "How would the issue be up today then? The case was set for trial July 8th." Defense counsel Wilkie replied that a prior attorney for defendant had made the motion and he was informed that, at that time, defendant had been found to be incompetent to stand trial. However, Wilkie acknowledged that defendant had been examined subsequently and had been found to be competent to stand trial. Defense counsel Wilkie then withdrew his motion for a competency hearing. On the next court date, October 24, 1985, the State reiterated that all fitness reports showed defendant to be fit and sane and wanted to be sure that defense counsel understood there was no need for a fitness hearing. Defense counsel concurred and stated that any motion regarding fitness had been withdrawn. Following several continuances, trial commenced on December 16, 1985.

At trial, Jeffery Hill, cab driver for his parents' cab company, tes-

---

[1]Apparently, Dr. Chin had refused to further examine defendant and Dr. Busey was substituted as the private doctor.

tified for the State that approximately 8 p.m. on May 27, 1984, he had picked up defendant at defendant's mother's house in Robbins, Illinois. Defendant wanted to go to Harvey. On the way to Harvey, Hill stopped at the home of Irvin Parker in Robbins to pick up and to pay for a package of drugs for another party. At Parker's house, both Hill and defendant got out of the cab. After Parker and Hill made the exchange, Parker said he wanted to talk to defendant alone. Hill walked back to his cab, and defendant went into Parker's house. Approximately five minutes later, defendant came out and told Hill that he wanted to go back to his mother's house to pick up something. At that time, Hill received a dispatch to return the cab to his parents' home. Hill drove defendant to his mother's house and returned the cab to his house. He then walked to his sister's house, approximately three blocks away, and borrowed her car, after which he picked up defendant and drove back to Parker's house so that defendant could complete a deal with Parker.

At Parker's house, both Hill and defendant got out of the car. Once again, Parker told Hill that he wanted to speak to defendant alone. Parker and defendant went inside and Hill remained outside. After waiting approximately 10 minutes, Hill went into the house. He peered into the front bedroom and saw Parker. Defendant then walked out of the bedroom, past Hill, into the living room and closed the front door. While defendant was in the living room, someone knocked at the front door. Hill heard defendant talking to a female, but could not discern what the female was saying.

Meanwhile, while defendant was out of the bedroom, Parker told Hill that he did not have any money and asked Hill to tell that to defendant for him. Parker then attempted to climb out of the bedroom window. At that time, defendant returned to the bedroom and said, "We cannot have any of this," and closed the window. Parker sat on the bed. Defendant was standing and holding a gun.

Hill then left the bedroom and stood in the living room, approximately three paces from the bedroom door. Defendant was standing inside the bedroom with his back to Hill. Hill could hear Parker pleading with defendant not to kill him and telling defendant that he did not have any money. Hill then saw Parker jump up from the bed with his hands in front of his face and heard four to six gunshots. Hill testified that he thought defendant was going to shoot him next. However, defendant said he was not going to shoot him and, instead, started to ransack the house. Hill saw Parker lying on the bedroom floor with blood around his head. He also noticed that telephone cords had been ripped out of the wall.

Defendant then said, "Let's go," walked out of Parker's house carrying a portable television set, and asked Hill to drive him to his brother's house in Markham. Hill suggested that they drive to the home of Tammy Holmes in Robbins instead. When they arrived at Holmes' trailer, Hill honked the car horn and Tammy came to the door. Hill told her that defendant had a television set he wanted to sell. When Tammy said that she did not have enough money to buy it, defendant telephoned his brother from Tammy's house and arranged for him to pick up the television there.

Officer Donald Davis of Robbins police department testified that approximately 10:45 p.m., on May 28, 1984, he had received a telephone call from Willie Evans, informing him that there was a body at Parker's address. When Davis arrived at Parker's house, he noticed that the front door was wide open. He entered the house and found Parker's body lying facedown in the bedroom. A telephone cord was wrapped around his fingers. Davis stated that the house had been ransacked. Two days later, Jeffery Hill called the Robbins police station to report the murder.

Officer Sylvester Stewart of the Robbins police department testified that he had investigated the murder scene on May 28, 1984, and had interviewed Hill on May 31, 1984. After interviewing Hill, Officer Stewart secured an arrest warrant for defendant on June 1, 1984, and arrested him at his residence later that day. At the time of the arrest, Officer Stewart recovered a Victor patch tube containing .22 caliber cartridges from defendant's residence. Earlier that day, Nathanial Fields, defendant's brother, had reported to the Markham police that his .22 caliber gun was missing. A .22 caliber bullet had been recovered from Parker's body.

At the conclusion of the State's case, defendant's motion for a directed finding was denied. Defense counsel Wilkie then entered a stipulation that none of the fingerprints found at the murder scene matched those of defendant and rested his case. Following closing arguments, the trial court found defendant guilty of murder, felony murder, armed robbery, home invasion and armed violence. Judgment was then entered on the convictions for murder and felony murder, all other offenses having merged with the murder conviction. Prior to the sentencing hearing, defendant was examined by two psychiatrists from the Psychiatric Institute and found mentally fit for sentencing. At the sentencing hearing, defendant's motion for a new trial was denied. After hearing arguments in aggravation, the court found defendant eligible for the death penalty. However, after defense counsel's argument in mitigation, the court determined that the death penalty would not

be imposed and sentenced defendant to a prison term of 40 years. Defendant's appeal followed.

Initially, defendant contends that defense counsel Wilkie's failure to investigate his psychiatric records and Wilkie's failure to present an insanity defense constituted ineffective assistance of counsel. Defendant claims that an investigation of his medical records would have led to a different action at the fitness hearing and might have led to an insanity defense at trial.

■■ In order to establish ineffective assistance of counsel, defendant must prove that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. The defendant bears the burden of proving that, absent counsel's errors, the fact finder would have had a reasonable doubt as to his guilt. *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Baldwin* (1989), 185 Ill. App. 3d 1079, 541 N.E.2d 1315.

■■■ In the present case, defendant's contention that he had been denied effective assistance of counsel is based on a faulty premise, a misleading interpretation of the record and conjecture. First, defendant argues at several points that defense counsel Wilkie had failed to investigate defendant's psychiatric records. However, the record contradicts this contention. Each time defense counsel withdrew and new counsel was substituted, the trial court supervised the transfer of all prior discovery, including psychiatric reports. Moreover, prior to trial, defense counsel Wilkie informed the court that he was aware that defendant had been found unfit to stand trial at one time, but that three subsequent examinations had found him fit. Thus, defense counsel Wilkie was familiar with the psychiatric reports relevant to defendant's fitness to stand trial and to his sanity at the time of the offense.

Defendant's reliance on the single report of unfitness as grounds for a conclusion that he would have been found unfit upon further investigation is misplaced. The report of unfitness was subsequently refuted by five psychiatric reports which found him mentally fit and concluded that he had been sane at the time of the offense. The first three reports were prepared prior to trial and the last two were prepared after trial and prior to sentencing. Furthermore, the single report of unfitness stated that, with treatment, defendant would most likely become fit. Thus, the facts do not support defendant's claim that the reports raised a reasonable doubt as to his mental condition. To the contrary, the record supports defense counsel's decision that an incompetency defense was not appropriate.

In addition, defendant has erroneously relied on *People v. Baldwin* (1989), 185 Ill. App. 3d 1079, 541 N.E.2d 1315, *People v. Murphy* (1987), 160 Ill. App. 3d 781, 513 N.E.2d 904, and *People v. Howard* (1979), 74 Ill. App. 3d 138, 392 N.E.2d 775, for his contention that a more complete investigation would have produced a different trial result as to his fitness. *Baldwin, Murphy* and *Howard* are factually distinguishable from the present case on the pivotal issue of the impact of fitness evidence not brought forward at trial. In *Baldwin,* on defendant's motion, a pretrial fitness hearing was held at which Dr. Markos, a psychiatrist, testified on behalf of the State that he had reviewed a psychological summary prepared by another psychiatrist which detailed defendant's admissions to various psychiatric institutions; diagnosed defendant as paranoid schizophrenic and concluded that defendant was unfit to stand trial. Dr. Markos concurred with the diagnosis and opined that defendant had a serious psychotic illness. Defendant then testified, stating that he was fit to stand trial, and answered several of the court's queries, indicating an awareness of the proceedings. The trial court ruled that defendant was fit to stand trial. On appeal, the reviewing court held that the trial court should not have rejected the expert's conclusion without more than just defendant's own testimony that he was fit, and that defense counsel's failure to investigate and to discover certain pertinent psychiatric records until after the trial clearly prejudiced defendant and constituted ineffective assistance of counsel.

By contrast, in the present case, there is no evidence that any psychiatric records of significance were overlooked. Moreover, any argument as to the possible impact of such records is mere conjecture which cannot support a claim for ineffective assistance of counsel. (*People v. Gierbolini* (1984), 128 Ill. App. 3d 794, 471 N.E.2d 625.) Further, as previously stated, the fact that three different psychiatrists had found defendant to be fit for trial effectively refuted any doubt as to defendant's mental condition, precluding the need for further investigation into defendant's past medical records. *People v. Schultz* (1989), 186 Ill. App. 3d 976, 542 N.E.2d 1272.

Defendant's reliance on *People v. Murphy* (1987), 160 Ill. App. 3d 781, 513 N.E.2d 904, is also misplaced. In *Murphy,* the reviewing court held that defendant had been denied effective assistance of counsel by his trial counsel's failure to investigate his mental condition or to obtain records of his prior hospitalizations when he had sufficient reason to suspect that defendant might not be fit to stand trial. Similarly, in *People v. Howard* (1979), 74 Ill. App. 3d 138, 392 N.E.2d 775, the court determined that defense counsel's failure to discover and to

use defendant's psychiatric records severely prejudiced the outcome of the competency hearing and required a reversal of defendant's conviction.

In both *Murphy* and *Howard*, defense counsel had failed to investigate defendant's psychiatric records when surrounding facts and circumstances raised a reasonable doubt as to the competency of the respective defendant. In neither case had there been psychiatric reports stating that defendant was fit to stand trial or that he had been sane at the time of the offense. In the present case, the only indication of unfitness was the first report prepared shortly after defendant had been arrested. As mentioned, this report stated that, with treatment, defendant would likely become fit to stand trial. The three subsequent psychiatric reports prepared before trial found defendant to be fit to stand trial and to have been sane at the time of the offense, thereby refuting any doubt as to defendant's competency or sanity.

Finally, there is no evidence in the record that had a fitness hearing been held, the results of the trial would have been different. (*Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) The same doctors who had filed reports would have testified as to their content. Therefore, defense counsel Wilkie properly determined that the need for a fitness hearing or the pursuit of an insanity defense was inappropriate.

Next, defendant contends that because the trial court had enough information about his mental condition to raise a reasonable doubt as to his competency, the court had a duty to hold a fitness hearing *sua sponte*, and it erred in failing to do so. Instead of holding the hearing, defendant argues that the trial court "actively discouraged defendant from seeking a fitness hearing and silently acquiesced when the State told defendant's new counsel that all the psychiatrists examining defendant had found him fit."

■ The determination of whether a *bona fide* doubt as to defendant's fitness to stand trial has been raised to warrant a hearing depends on the facts of each case and is largely within the discretion of the trial court. (*People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677.) In the present case, the circumstances surrounding defense counsel Beister's initial request for a fitness hearing and defense counsel Wilkie's withdrawal of the motion are pertinent to the issue of whether the trial court had a *bona fide* doubt as to defendant's fitness to stand trial. On October 31, 1984, defense counsel Beister requested a fitness hearing at which the psychiatrists who had submitted written reports and the psychiatrist who had been treating defendant for the past year would be present. The trial court granted the request and set

November 27, 1984, for the hearing. No further reference to a fitness hearing was made until September 25, 1985, even though 10 hearings had been held in the interim. At one point, a trial date had even been set for July 8, 1985. On September 25, defense counsel Wilkie stated that the matter was before the court on defendant's motion for a fitness hearing. Expecting the case to go to trial, the court asked, "When did this come up?" Defense counsel Wilkie explained that a prior attorney had made the motion. However, because defendant had since been found competent to stand trial, defense counsel Wilkie withdrew the motion. The court commented that there had been no such issue raised on July 8, and that they would proceed to trial. The cause was continued to October 24, 1985, at which time the State sought to confirm defense counsel's position that there would be no fitness hearing. The State mentioned the psychiatric reports which had found defendant fit for trial, but failed to mention the first report which had found him unfit. However, regardless of this omission by the State, the record indicates that defense counsel Wilkie was aware of all of the reports and that the State was not introducing any new information. Defense counsel acknowledged that he had withdrawn the motion for a fitness hearing. The trial date was then continued three times to December 16, 1985. Contrary to defendant's characterization of the trial court's role in the withdrawal of the motion for a fitness hearing, the trial court did not "actively discourage" defendant from seeking a fitness hearing, nor did the trial court "silently acquiesce" to the State's statement that there was to be no fitness hearing. The State merely sought confirmation of that fact from defense counsel.

 Furthermore, the trial court's initial agreement to hold a fitness hearing does not constitute irrefutable *bone fide* doubt, as defendant suggests. (See *People v. Eddmonds* (1984), 101 Ill. 2d 44, 461 N.E.2d 347.) In *Eddmonds*, defendant was charged by information with murder and deviate sexual assault. Upon the assistant public defender's request, the trial court ordered a psychiatric examination of defendant. Subsequently, on December 6, 1977, Dr. Reifman of the Psychiatric Institute submitted his report, stating that defendant was unfit for trial. As a result, the public defender petitioned for a fitness hearing by jury. The court entered an order setting January 12, 1978, for a fitness hearing. On that date, the public defender submitted a report from another psychiatrist stating that defendant was fit for trial. Consequently, another examination was ordered, and, on January 25, 1978, a private psychiatrist reported that defendant was unfit for trial. The public defender again petitioned the court for a fitness hearing by jury, and a hearing was set for March 8, 1978. The hearing was

continued three times by agreement.

On May 25, 1978, the public defender informed the trial court that he had spoken to Dr. Reifman, the first examining psychiatrist, and Dr. Reifman had requested that he be allowed to examine defendant again prior to the hearing. Dr. Reifman reexamined defendant on June 6, 1978, and found him fit to stand trial with medication. The public defender then asked the court to order a psychiatric examination to determine defendant's sanity at the time of the offense. The order was entered. However, the psychiatrist reported that he could give no opinion as to defendant's sanity at the time of the offense.

The *Eddmonds* court stated that the transcript of the proceedings on March 13, 1979, indicated some confusion as to whether defendant had been found unfit to stand trial. Finally, on April 4, 1979, in an attempt to clarify the situation, the public defender requested a reexamination of defendant as to his sanity at the time of the offense and as to his fitness to stand trial. Defendant was reexamined and found fit for trial.

In May 1979, defendant, appearing *pro se*, moved that the court appoint an attorney from the bar association to represent him rather than a public defender. The court appointed a new attorney, who promptly moved for a psychiatric examination of defendant to determine his sanity at the time of the offense. The examining doctor reported that, in his opinion, defendant was sane at the time of the offense. Defendant then requested a second examination. This exam was ordered, but the record on appeal did not contain the results. Following a bench trial, defendant was convicted of murder and deviate sexual assault and sentenced to death for the murder conviction and to 40 to 80 years' imprisonment for the deviate sexual assault conviction.

On direct appeal to the supreme court, defendant argued, *inter alia*, that the trial court had erred in proceeding to trial without conducting a fitness hearing when it had a *bona fide* doubt of his fitness as evidenced by its two orders for a fitness hearing. Based on the surrounding circumstances, the *Eddmonds* court held that the trial court had not erred in failing to order another fitness hearing *sua sponte*. The supreme court found the following circumstances relevant to its determination: (1) the most recent psychiatric reports available to the court tended to show defendant was fit for trial; (2) defense counsel had made no further request for a fitness hearing; (3) defendant had testified lucidly at both the pretrial hearing and at the trial; (4) the only evidence of defendant's unfitness for trial was reports by one doctor who subsequently changed his opinion, and of another doctor whose report of unfitness was made more than two years prior to trial.

In the present case, the evidence refuting any *bona fide* doubt as to defendant's fitness to stand trial is even stronger than that in *Eddmonds*. Here, the three most recent psychiatric reports indicated that defendant was fit for trial and had been sane at the time of the offense. After the initial request for a fitness hearing, none of the four subsequent defense counsel made a further request for such a hearing. Although defendant did not testify at trial, the record indicates he understood the trial proceedings by his voluntary waiver of a jury at trial and at sentencing, and his awareness of his family's desire to have him represented by private counsel rather than by the public defender's office. Finally, the only evidence as to defendant's unfitness was one psychiatric report which had been filed 1½ years prior to trial and had been refuted by three subsequent psychiatric reports. Accordingly, pursuant to *People v. Eddmonds* (1984), 101 Ill. 2d 44, 461 N.E.2d 347, the trial court did not abuse its discretion in failing to order a fitness hearing *sua sponte*.

Defendant next contends that defense counsel Wilkie's failure to move to suppress the only physical evidence linking defendant to the crime constituted ineffective assistance of counsel. Defendant's contention is predicated on the State's introduction into evidence of bullets seized in defendant's home at the time of his arrest. At the outset of his argument, defendant makes several references to a "warrantless search of defendant's home." In fact, defendant was arrested in his home pursuant to a valid arrest warrant and, although there was no search warrant, there is no evidence that defendant's home had been searched. In light of the fact that there is no question as to the validity of the arrest warrant, the bullets could have been properly seized incident to the lawful arrest.

■■ Failure of counsel to suppress evidence is not *per se* incompetence. Whether or not the motion should be filed is a question of trial tactics and generally has no relation to counsel's competence. (*People v. Gierbolini* (1984), 128 Ill. App. 3d 794, 471 N.E.2d 625.) In the present case, defendant claims that it is "reasonably probable" that had the motion been filed, the verdict would have been different because the conviction would rest solely on the testimony of Hill, an admitted drug courier. Defendant's argument is mere conjecture and has no basis in fact. It is well recognized that a claim of ineffective assistance of counsel cannot be based on mere conjecture. (*People v. Gierbolini* (1984), 128 Ill. App. 3d 794, 471 N.E.2d 625.) Accordingly, whether a motion to suppress would have been successful is not so clear as to conclude that had the motion been filed, the outcome of the trial would have been different.

Defendant further argues that the testimony of Jeffery Hill, the sole eyewitness, was so "preposterous" and "improbable" as to fail to support defendant's conviction. Defendant bases this claim on the following: (1) Hill's testimony was guaranteed by a court order and a bond; (2) Hill stated that he had charged defendant for transporting him to and from Parker's house twice; (3) Hill claimed that he had been acting in the capacity of a cab driver even when he was driving his sister's car; (4) Hill's primary contact with Parker was drug dealing; (5) Hill never drove defendant to his original destination; (6) it took an unexplained six hours for Hill to get his sister's car; (7) Hill claimed that he never saw the shooting although he had been standing a few paces outside the bedroom door; (8) after defendant shot Parker, Hill claimed he was in fear of his own life, yet he refused to drive defendant to his brother's house; and (9) Hill did not report the murder for two days.

■ It is well established that a reviewing court will not substitute its judgment for that of the trier of fact who heard the evidence and had the opportunity to observe the witness' demeanor unless the evidence is so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to cause a reasonable doubt as to defendant's guilt. (*People v. Cooper* (1987), 164 Ill. App. 3d 734, 518 N.E.2d 260.) In the present case, this standard for reversal has not been satisfied.

■ ■ First, whether Hill's testimony had been guaranteed by a court order and bond does not impact on the reasonableness or probability of his testimony. (See *People v. Cooper* (1987), 164 Ill. App. 3d 734, 518 N.E.2d 260 (a grant of immunity from prosecution and the dropping of other unrelated charges is not indicative of unreasonable or improbable testimony).) Second, with respect to the allegedly "preposterous" statements referenced by defendant, none of these statements is so unreasonable or improbable as to raise a reasonable doubt as to defendant's guilt. Hill's statements that he had been acting in the capacity of a cab driver, had charged defendant for the ride, and had delivered drugs to Parker are not relevant to a determination of defendant's guilt. They are simply factors to be considered by the trial court in assessing Hill's credibility. (*People v. Cooper*, 164 Ill. App. 3d 734, 518 N.E.2d 260.) The fact that Hill never drove defendant to his original destination is not preposterous in light of the intervening events. Regarding the events at Parker's house, Hill testified that, at the time of the shooting, he had been standing outside the bedroom doorway and defendant had his back to him. Thus, he would not have been able to see defendant actually shoot Parker. However, he stated

that defendant had a gun, he heard shots coming from the bedroom, and he later saw Parker lying on the floor in a pool of blood. After the shooting, Hill was afraid that defendant was going to shoot him. Defendant said he had no plans to shoot Hill, but wanted Hill to drive him to his brother's house so that he could give his brother the television set he had taken from Parker's house. Not wanting to drive defendant to his brother's house, Hill offered to drive defendant to Tammy Holmes' trailer to see if she wanted to buy the television. Defendant agreed to the alternative plan, and when Holmes did not want to buy the television, he called his brother from her trailer and told him to pick up the television there. Defendant incorrectly states that Hill testified that it had taken six hours for Hill to get his sister's car. In fact, Hill testified that it took him approximately one hour to get the car and to pick up defendant, explaining that it had taken some time to convince his sister to let him use her car. Finally, Hill's failure to report the shooting for two days is indicative of nothing more than fear for his life. When he did report the shooting, he did so on his own volition. The fact that he did not keep his initial appointments with the police merely confirms his fear. Accordingly, we conclude that Hill's testimony was not so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to justify reversal of defendant's conviction.

■■■ Lastly, defendant argues that the trial court improperly convicted him of both murder and felony murder when only one death occurred. On appeal, the State agrees with defendant that where only one person is murdered, there can be but one conviction, and that the sentence must be imposed on the most serious offense. (*People v. Hosty* (1986), 146 Ill. App. 3d 876, 497 N.E.2d 334.) Accordingly, because intentional murder has the more culpable mental state, the conviction for murder should be affirmed and the conviction for felony murder vacated. In addition, because it is not clear from the record whether the sentence was predicated on defendant's conviction of both murder and felony murder, the matter should be remanded for resentencing on the murder conviction. See *People v. Plummer* (1986), 151 Ill. App. 3d 94, 502 N.E.2d 1120.

For the aforementioned reasons, the judgment of the trial court as to defendant's conviction for murder is affirmed; the conviction for felony murder is vacated, and the cause is remanded for resentencing.

Affirmed in part; vacated in part and remanded for resentencing.

O'CONNOR and MANNING, JJ., concur.